HARTZ, Circuit Judge,
dissenting:
I respectfully dissent. In my view the district court abused its discretion in limiting MMF’s cross-examination of Mark Monsour.
As the president and co-owner of Mons-our’s, Mr. Monsour had a substantial financial stake in the litigation. Also, as the panel majority states, he “was Monsour’s main witness at trial.” Op. at 800. His credibility was critical. The jury had a right to know whether he was the sort of person who would tell big lies when big money was at stake. But the district court prevented MMF from putting on highly probative evidence that he was such a person. And I see no countervailing reason to exclude that evidence. Allowing MMF to put on the excluded evidence would have consumed very little time, and could hardly have confused or misdirected the jury; nor would the evidence have created any risk of unfair prejudice.
It is useful to compare the testimony at trial to what should have been elicited. On direct examination Mr. Monsour was questioned by his attorney about two Mons-our’s balance sheets with the same date (which was one month before the parties entered into their Asset Purchase Agreement) but very different figures for the value of the food service inventory:
Q. Let’s talk about Monsour’s food service inventory. Can you tell the jury what Exhibit 447 is?
A. It’s a Monsour balance sheet.
Q. This has already been admitted in evidence. Can you tell the jury, what is this based upon? I’m sorry. Bad question. What does it show the inventory was — what does it show the inventory was, that inventory at Monsour’s as of December 29th, 2001?
A. $997,950.
Q. You’re getting that from the line right next to what I highlighted?
A. That’s correct.
Q. Was this true and accurate?
A. Yes, sir.
Q. And what was it based upon?
A. It would have been an inventory valuation done probably in the days preceding the preparation of this statement off of the inventory valuation report.
Q. This is about a month before the asset purchase agreement was executed. Do you have any knowledge as to whether or not this document was supplied to Menu Maker Foods?
A. I do not know.
Q. Can you tell the jury what Exhibit 412 is?
A. It’s a balance sheet.
Q. What’s the date of this balance sheet?
A. 12-29-2001.
Q. This is the exact same date as the Exhibit 447 that we went over a second ago. Tell the jury what the inventory indicates on this Exhibit 412?
A. 1,643,819.
Q. Can you tell the jury whether or not — does this balance sheet, the one that shows 1.6 million, does that reflect what the actual cost of your inventory was?
A. No.
Q. Now, the one that showed $997,000, the one I just showed you a few minutes ago, did that reflect what *805 the actual cost of your inventory was?
A. Yes.
Q. Now, this document shows 1.6 million, Exhibit 412, was that ever provided to Menu Maker Foods?
A. No.
Q. Just so it’s clear to the jury what was the actual cost of your inventory on December 29th, 2001?
A. $997,950.
ApltApp., Vol. 4 at 23-24. Thus, Mr. Monsour acknowledged that the higher figure (higher by about $650,000) was incorrect. But the testimony would not suggest any lack of veracity of Mr. Monsour. He admitted no role in the error, nor did he explain the reason for the error.
MMF’s attorney tried to elicit those matters on cross-examination, both with respect to the inventory figures and with respect to accounts-receivable figures (on the same document) not addressed on direct examination. But because of the district court’s ruling limiting the cross-examination, the jury heard only the following. First, counsel emphasized the differences in the figures:
Q. Mr. Monsour, do you have Exhibit 447 in front of you?
A. Yes, sir.
Q. Okay. This is my copy of 447, and you will confirm I have highlighted portions of that document?
A. Yes, sir.
[discussion of overhead projector omitted]
Q. This is 447 that we just talked about, Exhibit 447?
A. Correct.
Q. I have highlighted on the accounts receivable trade and inventory, correct?
A. Correct.
Q. I have highlighted the date?
A. Yes, sir.
Q. Mr. Monsour, can you go to Exhibit 412, which was admitted yesterday during your testimony?
A. Yes, sir.
Q. Mr. Monsour, I’m going to show you my copy of that exhibit. I have highlighted the date and the accounts receivable, trade. I have highlighted the inventory balance and frankly I have highlighted current liabilities, notes, payables.
A. Yes, sir.
Q. That’s actually highlighted on your exhibit, isn’t it?
A. Yes, sir.
Q. Is that on 412?
A. Uh-huh.
Q. Mr. Monsour, Exhibit 412 was admitted yesterday. Exhibit 12 is a balance sheet, correct?
A. Yes, sir.
Q. And it’s a balance sheet of 12-29-2001?
A. Yes, sir.
Q. And that’s the same date as Exhibit 447?
A. Correct.
Q. But yesterday — I’m sorry. And that exhibit shows an account receivable trade of $1,073,575.46?
A. Yes, sir.
Q. Shows an inventory of $1,643,819.80?
A. Yes, sir.
Q. I placed that on the [projector]. It won’t work that way. But exhibit 447 shows an accounts receivable trade of $894,841.36, and Exhibit 412 show $1,073,575.46. Yesterday you testified that Exhibit 412 was inaccurate. Is that your testimony today?
A. Yes, sir.
*806 Q. Okay. So that number is the one million 73 thousand and change is an inaccurate number?
A. Yes, sir.
Q. And the inventory on that document shows $1,643,819.80 as opposed to 447, which shows $997,950, right?
A. Yes, sir.
Q. And that number is inaccurate, correct?
A. Yes, sir.
Id. at 212-15. Then counsel unsuccessfully attempted to question Mr. Monsour about the reason for the discrepancy in the figures:
Q. Mr. Monsour, I don’t understand why the numbers are inaccurate. Can you tell me why?
A. I believe Judge Marten instructed me to not talk about that.
Attorney for [MMF]: Your Honor, may we please have a bench conference?
The Court: Certainly
(Off the record bench conference.)
Q. [Attorney for MMF] Mr. Monsour, I’m exhibiting Exhibit 412 on the [projector], I’m putting the top part of it. I’ll tell you that post-it notes appear that I put there. Mr. Monsour, tell us, if you can, who prepared this balance sheet as of 12-29-2001?
A. Shelly Corn.
Q. Okay. Was it prepared at your instruction?
A. Most likely.
Q. Best of your recollection it was?
A. Yes.
Q. There’s a discrepancy between Exhibits 412. There are two, actually, between 412 and 447. First discrepancy is in accounts receivable. 447 says there was 894,841.36 accounts receivable and Exhibit 412 shows a 1,073,576.46. How [d]o you account for that discrepancy?
A. The larger one is inaccurate.
Q. To which you have testified before, but how do you an [sic] account for that discrepancy?
A. The numbers are inflated.
Q. Let me direct your attention to 447 and 412, inventory valuation. Number on 47 is 997,950 even. Inventory on 412 is 1,643,819. There’s a discrepancy between those two documents on inventory valuations. How do you account for that?
A. Larger numbers are inaccurate.
Q. Yes, sir. They are thank you. How do you account for the inaccuracy?
A. The larger numbers are inflated.
Q. At your direction? The inflation of the numbers?
A. I think I have been directed by Judge Marten to not talk about that.
The Court: I think you have taken it about as far as you can go.
Id. at 215-16.
The majority opinion states that “Mr. Monsour essentially testified that the misstatements were intentional and that he had been dishonest.” Op. at 801. But I cannot agree with that characterization. He admitted that there were misstatements, that the figures were inflated, and that the balance sheet “was prepared at [his] instruction.” But he did not admit that he (or anyone else) intended the figures to be incorrect or even that he knew the figures to be incorrect when the balance sheet was prepared. A jury would have to speculate to infer from this testimony that Mr. Monsour had engaged in any misconduct that would damage his credibility.
*807 Compare that cross-examination testimony to Mr. Monsour’s testimony at his deposition. The first part of the deposition testimony resembles what was presented at trial:
Q. Just take a look at 9 and 9A. [Deposition Exhibit 9 became Trial Exhibit 412 and Deposition Exhibit 9A became Trial Exhibit 447]. When I review those documents, in the entry “Accounts Receivable — trade (net),” do you see that entry?
A. Both documents. Correct.
Q. And 9 reflects “Accounts Receivable — trade (net) value of $1,090,500,” and 9A reflects “$765,-071”; they are of like date. I don’t understand the difference; can you explain it to me?
A. I will have to review them, but I will try to explain it.
[Counsel for Monsour’s]: Take your time.
Id., Vol. 2 at 376.
But then counsel elicited Mr. Monsour’s involvement and motive, two critical facts not presented to the jury:
Q. [By Counsel for MMF]: And I just want you to explain that entry to me.
A. Which entry is that?
Q. The “Accounts Receivable — Trade (net).”
A. Could be one of two things. One, sometimes from Shelly’s cutoff to when she actually brings them up-to-date, those numbers can change. Or two, I could have told her to raise those numbers.
Q. Why would you do that?
A. To make the balance sheet look better.
Q. Why would you do that?
A. For bank purposes.
Q. Why would you do that? I don’t understand.
A. To stop a loan from being called.
Q. Are you familiar with the term “dishonest”?
A. Yes, sir.
Q. Don’t you think that is just downright dishonest?
A. What it is is a man trying to keep his business going.
Q. I understand that. And therefore, would I be correct in understanding that you were willing to do anything that you could do to keep your business afloat, including provide false information to lending institutions; isn’t that true?
A. That is true.
Q. All right. Good. Let’s look at the inventory amount. I will tell you that Exhibit 9 shows an inventory of $1,643,820, and Exhibit 9A shows $997,950; can you account for the difference in that?
A. That would have been artificial inflation on my part.
Q. Sir?
A. I would have told Shelly Com to raise that number.
Q. For the same reason that you gave me for artificially inflating accounts receivable trade net?
A. Yes, sir.
Id. (emphases added). Had MMF been permitted to pursue this cross-examination at trial, the jury could have drawn a rather different picture of Mr. Monsour’s credibility.
The district court’s expressed reasons for excluding the cross-examination are unsupportable. Before Mr. Monsour testified, the court granted Monsour’s motion in limine to exclude the evidence “because it is irrelevant.” Id. at 423. I do not understand, however, how evidence so clearly probative of a lack of veracity could be irrelevant. -Then, after the above-quot *808 ed cross-examination, when MMF’s counsel again requested an opportunity to question Mr. Monsour on the matter, the court said: “I’m going to keep it out. The reason is the 403[sic], I think that the danger of unfair prejudice substantially outweighs any probative value; that getting into the reasons for the inflated balance sheet would provide to the jury.” Id., Vol. 4 at 283. With all due deference (and we owe the trial judge great deference), I cannot follow this explanation. If the concern is that the jury might think that Exhibit 412 was given to MMF, I would think that the jury need only be informed (as Mr. Monsour testified on direct examination) that it had not been. Jurors are not idiots. Or if the concern is that the jury might infer that some other inventory numbers given to MMF were false, that is not a legitimate concern. A jury should not be precluded from inferring that a witness who would lie on one occasion for business reasons would lie on other occasions. And if the concern is that too much court time would be expended by Mr. Monsour in explaining his justification for lying to banks, then perhaps trial judges should always exclude impeachment evidence on the ground that the witness will need too much time to rationalize lying. MMF was not seeking to take the court’s time by inquiring into alleged errors in numerous reports. Indeed, it was not seeking to question Mr. Monsour on any additional documents. It simply wished to elicit that Mr. Monsour had intentionally falsified the document about which he had been cross-examined and that he did it to save his business. That would have been devastating impeachment; nothing else in the cross-examination came close to having such an effect.
In short, the restriction on the cross-examination of Mr. Monsour was clear error. And the error requires reversal of the verdict.
I have no substantial disagreement with the majority opinion’s analysis of the other issues on appeal. But that analysis would be mooted by requiring a new trial at which MMF could conduct a proper cross-examination of Mr. Monsour.